UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SHEILA SUMPTER | ) | |
| | ) | |
| | ) | CIVIL ACTION FILE NO. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| GRADY MEMORIAL HOSPITAL | ) | |
| CORPORATION D/B/A GRADY HEALTH | ) | |
| SYSTEM; and | ) | |
| RAPHAEL GERSHON | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff  Sheila Sumpter ("Ms. Sumpter" or "Plaintiff") respectfully submits this Complaint for Damages and Equitable Relief:

## INTRODUCTION

1.     Ms. Sumpter is an African American female who was formerly employed by Grady Memorial Hospital Corporation d/b/a Grady Health System for fifteen years as a Certified Registered Nurse Anesthetist (CRNA). Despite satisfactory performance in her role, Ms. Sumpter suffered disparate treatment,

retaliation, a hostile work environment and termination, based on her race and gender.

2.      Plaintiff files this Complaint for declaratory, injunctive, and monetary relief against Defendant Grady Memorial Hospital Corporation d/b/a Grady Health System for race discrimination and retaliation in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII) and sex discrimination and retaliation in violation of Title VII and against Defendant Raphael Gershon for race discrimination and retaliation in violation of 42 U.S.C. § 1981.

## JURISDICTION AND VENUE

3.      Plaintiff brings this action pursuant to 42 U.S.C. § 1981, as well as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Jurisdiction is invoked pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

4.      The unlawful violations of Plaintiff's civil rights were committed within the Northern District of Georgia.  Venue is proper in this Court under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## ADMINISTRATIVE EXHAUSTION

5.     Ms. Sumpter has satisfied all administrative prerequisites to perfect her claims of discrimination and retaliation under Title VII. Specifically, she has timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging race and sex discrimination and retaliation and timely filed this lawsuit following receipt of a Notice of Right to Sue Letter for her claims under Title VII of the Civil Rights Act of 1964.

## **PARTIES**

6.     Ms. Sumpter is now and was at all times relevant to this action, a citizen of the United States entitled to bring actions of this type and nature. Plaintiff is now and was at all times relevant to this action a resident of the state of Georgia.

7.     Defendant Grady Memorial Hospital Corporation d/b/a Grady Health System ("Grady") is a Georgia non-profit corporation. Its principal office address is located at 80 Jesse Hill Jr. Drive, SE, P.O. Box 26145, Atlanta, GA, 30303. Its registered agent for service of process is Timothy Jefferson. Process can be served at 80 Jesse Hill Jr. Drive SE, Atlanta, GA, 30303.

8.     Defendant Raphael Gershon ("Gershon") is a white male and at all relevant times served as the Director of Anesthesia at Grady. Gershon is subject to the jurisdiction of this Court and may be served with process by personal service or

leaving copies of the summons and complaint at his dwelling house or usual place of abode with some person of suitable age and discretion residing there, or by delivering a copy of the summons and complaint to an agent authorized to receive service of process.

## STATEMENT OF FACTS

9.     Ms. Sumpter is an African American female.

10.    From 2003 to June 2020, Ms. Sumpter worked for Grady as a Certified Registered Nurse Anesthetist (CRNA).

11.    Unlike Anesthesia Assistants ("AA"), CRNAs are licensed and are able to practice independent of an Anesthesiologist.

12.    At all relevant times all anesthetists (which includes AAs and CRNAs) and anesthesiologists at Grady were functionally under Gershon's supervision.

13.    As alleged further herein, Ms. Sumpter was dependent on Gershon's "sign off" of on her recredentialing for her to continue working at Grady.

14.    Historically, Gershon had been the one to personally decide who serves as the Chief Anesthetist.

15.    Gershon had previously selected predecessors in this position and, was pushing for the current interim chief (white) to be the next chief.

16.     In October or November 2018, CRNAs Ms. Sumpter, Erica Moore (African American female) and John Ohanu (African American male) wrote to Deb Hamrick, Director of Perioperative Services and Dr. Rhonda Scott, former CEO, that the CRNAs (all but two of whom were African American) were not being fairly represented in the department and were constantly passed over for managerial or team leading roles.

17.     Ms. Sumpter recommended Erica Moore to be considered for the position of Chief Anesthetist.

18.     Ms. Moore was a few months from completing DNP (Doctorate of Nursing Practice), which made her the highest qualified anesthetist candidate at Grady.

19.     Ms. Sumpter wrote to Gershon and Dr. Aora, Gershon's assistant, recommending Ms. Moore for the chief position. Neither Gershon nor Aora responded to her in any substantive manner.

20.     On or about November 1, 2018, Grady announced that George Williams (African American) would be the new Chief Anesthetist.

21.    For the first time in a considerable period, Gershon did not play a role in the hiring or promotion process which on information and belief was due at least in part to the letters Plaintiff and others wrote.

22.    Brittany Nye (then-interim chief) sent an email to entire department encouraging them to reach out to the administration and express their desire for a person on the inside to be hired and  not an "outsider."

23.    Ms. Sumpter responded to Nye's email, stating that Ms. Sumpter had been an employee for fifteen years and to support Mr. Williams and give him the opportunity to come and do his job. As part of her email, Ms. Sumpter stated that "[p]eople have been given positions in our department without any explanation or without others that may be just as capable and qualified to apply . . ."

24.    Ms. Sumpter's statement regarding past hiring practices overlooking qualified candidates was in opposition to Gershon's previous hand-picking of white candidates over other qualified candidates such as Ms. Moore, on whose behalf Ms. Sumpter had previously written to Gershon.

25.    Further, Ms. Sumpter was writing in response to concerns expressed within the department about an "outsider" (Mr. Williams, African American) taking over the position.

26.     From that time on Ms. Sumpter experienced retaliation and was subjected to a hostile and discriminatory work environment based on her race and sex.

27.     Gershon began to stop speaking to Ms. Sumpter and to avoid looking at her or acknowledging her when they passed one another. He eventually stopped looking at or speaking to her.

28.     At one point, Ms. Sumpter approached Gershon to discuss a work issue but Gershon never gave her the opportunity to do so. Ms. Sumpter was forced to escalate the underlying issue and provide a written account to Mr.  Williams.

29.     Ms. Sumpter also informed Mr. Williams that Gershon had refused to discuss the matter with her. After that, other white anesthesiologists began to make rude and condescending comments to Ms. Sumpter and became unfairly and unfoundedly critical of her judgment and decision making skills in a way they had not been before.

30.     Further, Grady began assigning Ms. Sumpter's work assignments in a manner different from her colleagues.

31.     For example, when Ms. Sumpter worked the day shift, Grady never or at most very rarely assigned Ms. Sumpter to areas such as the Neuro unit, preop or

third call, which would have enabled her to become more familiar with the computerized preop process for surgery patients.

32.    Ms. Sumpter specifically raised this issue in her performance review and requested additional work in these areas to further familiarize herself with the process and advance her skills.

33.    Gershon did not, however, permit her this opportunity, even though it would have benefitted Ms. Sumpter in performing her patient duties.

34.    Ms. Sumpter's white colleague, however, received assignments in all three of these areas.

35.    Gershon  - who made out the daily assignments - retaliatorily changed Ms. Sumpter's work assignments in a manner adverse to Ms. Sumpter and different from her white colleagues.

36.    In the next roughly six-week period, Ms. Sumpter was required to cover the GI center over 50% of the time she worked the day shift which was a less favorable and beneficial assignment.

37.    Covering the GI center is less favorable and beneficial when a person is assigned there almost consistently because most patients are Monitored

Anesthesia Care cases, in which the patient is typically minimally sedated, which limits the employee's opportunity to perform and advance their anesthesia skills.

38.   During that six-week period, Ms. Sumpter's white colleague (who worked the same hours per week as Ms. Sumpter) was assigned to the GI center only three times and received assignments to work in the areas in which Ms. Sumpter had previously requested she receive additional work and experience.

39.   Despite Ms. Sumpter making a request to be placed in those areas to continue to bolster her professional development, work skills, and work opportunities, Gershon never assigned her to those areas.

40.   She instead was sent to Neuro only in emergency situations.

41.   Every two years, CRNAs are required to re-submit paperwork to keep their privileges to practice at Grady current.

42.   It is standard for Gershon, the Director of Anesthesia, to sign off on the paperwork.

43.   Ms. Sumpter discovered on Sept 6, 2019 that Gershon, continuing his discriminatory and retaliatory conduct, had refused to sign off on her paperwork stating only that he had, apparently unspecified, "issues" with her.

44.     One of the other anesthesiologists, who was African American, offered to sign off on Ms. Sumpter's paperwork but was told it had to be Gershon who did so.

45.     Two weeks later, Gershon had still refused to sign.

46.     Without Gershon's signature for her re-credentialing, Ms. Sumpter would not be permitted to continue to practice at Grady and his refusal would also be highly detrimental to her career prospects elsewhere. Her livelihood was at stake.

47.     Nothing in Ms. Sumpter's job performance or performance reviews justified Gershon's continued refusal to sign.

48.     Ms. Sumpter complained to George Williams, Chief CRNA, who informed her that he had met with Human Resources.

49.     According to Mr. Williams and Human Resources, this had never happened before and Gershon had never refused to sign anyone else's paperwork.

50.     Ms. Sumpter also met with Deb Hamrick, the Director of Perioperative services, and informed her in this conversation that she planned to go the EEOC about Gershon's conduct.

51.     Ms. Hamrick stated that Gershon's conduct was "retaliation" and was wrong and was "harassment."

52.   Ms. Hamrick encouraged Ms. Sumpter to call Grady's Compliance Hotline (and told her she should specifically mention the "hostile environment").

53.   One of Ms. Sumpter's African American co-workers who also wrote letters to support change in the work environment was terminated shortly after for an alleged reason that, based on Ms. Sumpter's understanding and experience, would not have resulted in a white employee being terminated. Ms. Hamrick stated that what Gershon was doing to retaliate against Ms. Sumpter was "exactly what he did" to this other individual.

54.    Ms. Hamrick also suggested Ms. Sumpter speak with another Grady employee who Ms. Sumpter understood was experiencing issues with Dr. Gershon, and who had retained a "labor attorney."

55.   Ms. Hamrick also identified other individuals who were experiencing difficulties with Gershon's treatment and stated that "it seems to be with females."

56.   Ms. Sumpter subsequently contacted the Compliance Hotline and complained about Gershon's and certain other white physicians' mistreatment of her.

57.   On or about September 26, 2019, Grady informed Ms. Sumpter that HR and others in administration were now involved and that Gershon was required to

sign Ms. Sumpter's paperwork, but Ms. Sumpter was informed he had signed with a "with reservations" notation.

58.     Ms. Sumpter requested an official copy for her records, but Grady HR did not respond.

59.     Ms. Sumpter then learned that just two days after she complained to the Compliance hotline about Gershon's and others' behavior, Gershon had five non-African American colleagues write disparaging letters about Ms. Sumpter's job performance (despite her yearly evaluations and true job performance reflecting otherwise).

60.     Ms. Sumpter later learned that Gershon had asked all the Anesthesiologists to write such letters but only five agreed to do so.

61.     On information and belief, all six African American Anesthesiologists and five other non-African American Anesthesiologists refused to write disparaging letters or support Gershon's discriminatory and retaliatory campaign against Ms. Sumpter.

62.     The five letters were apparently all within 30 minutes of each other on the same day and allege performance issues with respect to Ms. Sumpter which she

disputes, and which had not been brought to her attention before, either in performance reviews or otherwise.

63.     The letters, written at Gershon's behest, were in furtherance of the campaign of discrimination and retaliation against Ms. Sumpter

64.     The letters contain numerous false statements concerning Ms. Sumpter and her job performance and caused her significant emotional distress because they threatened her reputation and livelihood.

65.     Dr. Matthew Hunter alleged, in part, in his letter that Ms. Sumpter was responsible for a "near miss" with a patient, meaning that the patient almost died.

66.     No such allegation had ever been presented to Ms. Sumpter before.

67.     These allegations and numerous others in Hunter's letter and the other letters are not true and were simply part of and in furtherance of the retaliatory and discriminatory campaign against Ms. Sumpter.

68.     Grady has a reporting system for all near misses. If the incident were as Hunter alleged, he should have immediately reported it and documented it.

69.      Instead, Hunter waited 8 months – and only after Ms. Sumpter had complained of discriminatory treatment and Gershon had recruited him to write a false negative appraisal of Ms. Sumpter - to raise this allegation.

70.     Hunter never said anything about this alleged incident to Ms. Sumpter, who had worked with him on numerous occasions since the alleged incident.

71.     Hunter has never removed Ms. Sumpter from a case and has left trauma cases with Ms. Sumpter as soon as the patient was stabilized to return to his call room to sleep.

72.     Defendants' ongoing discrimination and retaliation against Ms. Sumpter, which now included unfounded allegations of serious performance issues and interference with her recredentialing, threatened her livelihood and forced her to have to take medical leave and expend accrued time off to escape the ongoing hostile work environment and the serious and detrimental toll it was taking on her.

73.     Ms. Sumpter engaged in further protected activity by filing her EEOC charge of discrimination in October 2019, while she was on the forced leave.

74.     Ms. Sumpter attempted to return to Grady in June 2020, having exhausted her paid and unpaid leave options.

75.     Upon her return, Ms. Sumpter continued to experience exclusion, interference with her schedule, further retaliation and an ongoing hostile work environment that made the workplace intolerable.

76.     Although Ms. Sumpter had discussed her desire to work two 12 hour shifts on Thursdays and Friday with Mr. Williams and HR, it was granted for July only, even though on information and belief Grady spends substantially more money (almost double) on locum anesthetists to fill those same shifts.

77.      Instead, Ms. Sumpter was assigned to work the day shift which would put her in greater contact with Gershon and others who unfairly criticized her in the discriminatory and retaliatory letters.

78.     Gershon continued his retaliatory behavior by placing Mrs. Sumpter in the cataract room – which required minimal sedation and thus provided little opportunity for Ms. Sumpter's professional development - on 3 of the next 4 days that she worked, while her colleagues were rotated throughout the OR.

79.     Gershon along with several doctors and colleagues further continued to not speak to Ms. Sumpter upon her return, resulting in continued retaliation, ostracization, and exclusion.

80.     Ms. Sumpter then learned that following a procedure in which she had assisted an Anesthesiologist, Gershon summoned this physician into his office and grilled the physician about Ms. Sumpter's performance.

81.    Ms. Sumpter was informed that Gershon appeared to be looking for something to blame her for and that when he was unsuccessful, he appeared defeated or frustrated.

82.    This incident confirmed to Ms. Sumpter what she already feared to be the case based on what she had already experienced – that she could not work in an environment where Gershon and likely others would be on a constant "witch hunt" to find anything they could try to use against her, either to justify their own discriminatory and retaliatory actions or to take further retaliatory action against her.

83.    In July 2020, Ms. Sumpter was forced to submit her resignation.

84.    Ms. Sumpter stated in part in her resignation letter that the work situation and scheduling being required of her, including placing her back into direct contact with those who had already discriminated and retaliated against her and were continuing to do so, led her to "believe I have no choice but to resign as continuing in the workplace creates an intolerable environment."

85.    Grady constructively discharged Ms. Sumpter.

## COUNT I
### Race Discrimination in violation of 42 U.S.C. § 1981
### *(Against All Defendants)*

86.    All preceding paragraphs are incorporated herein by reference.

16

87.    At all times material to this Complaint, Plaintiff and Defendant Grady were parties to an employment agreement under which Plaintiff worked for Grady and Grady compensated her for her work.

88.    Defendant Gershon exercised supervisory authority or de facto supervisory authority over Plaintiff by virtue of his position, control of scheduling, control over staffing, and ability to determine Plaintiff's recredentialing.

89.    Plaintiff is African American.

90.    Plaintiff performed her obligations under her employment agreement.

91.    42 U.S.C. § 1981 prohibits Defendants from discriminating against Plaintiff on the basis of race with regard to the making and enforcing of her employment agreement with Defendant Grady.

92.    The above-pleaded discriminatory conduct toward Plaintiff, including, but not limited to, demeaning and exclusionary treatment, discrimination in her scheduling and assignments, unjustified interference with her professional credentialing and livelihood, unjustified criticism, excessive scrutiny, and her discriminatory constructive termination based on race constitutes unlawful race discrimination against Plaintiff in the terms and conditions of her employment in violation of 42 U.S.C. § 1981.

93.   Defendants violated Plaintiff's rights under 42 U.S.C. § 1981 by subjecting her to disparate treatment and constructively terminating her employment because of her race.

94.   Defendants undertook their conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, or additionally, and in the alternative, undertook their conduct recklessly with respect to Plaintiff and her federally protected rights, entitling Plaintiff to recover punitive damages against Defendants.

95.   Defendants' actions constitute unlawful intentional race discrimination in violation of 42 U.S.C. § 1981.

96.   Defendants willfully and wantonly disregarded Plaintiff's federally protected rights and Defendants' discrimination against Plaintiff was undertaken in bad faith.

97.   As a direct and proximate result of Defendants' violations of 42 U.S.C. § 1981, Plaintiff has suffered damages including lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

98.   Accordingly, Plaintiff is entitled to the equitable and monetary relief set forth in the following prayer for relief for Defendants' violation of her rights under 42 U.S.C. § 1981.

## COUNT II
### Retaliation and Retaliatory Hostile Work Environment in Violation of 42 U.S.C. § 1981
*(Against All Defendants)*

99.   Paragraphs 1 through 85 are incorporated herein by reference.

100.   At all times material to this Complaint, Plaintiff and Defendant Grady were parties to an employment agreement under which Plaintiff worked for Grady and Grady compensated her for her work.

101.   Defendant Gershon exercised supervisory authority or de facto supervisory authority over Plaintiff by virtue of his position, influence over scheduling, control over staffing, and ability to determine Plaintiff's recredentialing.

102.   Plaintiff is African American.

103.   Plaintiff performed her obligations under her employment agreement.

104.   Plaintiff engaged in statutorily protected activity by objecting to, reporting, and complaining of race discrimination prohibited by 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

19

including but not limited to making internal complaints and the filing of a charge of discrimination with the EEOC.

105.   42 U.S.C. § 1981 prohibits the Defendants from retaliating against Plaintiff because she opposed, objected to, and complained against race discrimination prohibited by 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

106.   Defendants subjected Plaintiff to retaliation for her protected conduct, including, but not limited to, demeaning and exclusionary treatment, disparate treatment in her scheduling and assignments, unjustified interference with her professional credentialing and livelihood, unjustified criticism, excessive scrutiny, and her constructive termination in violation of 42 U.S.C. § 1981.

107.   Defendants undertook their conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, or additionally, and in the alternative, undertook their conduct recklessly with respect to Plaintiff and her federally protected rights, entitling Plaintiff to recover punitive damages against Defendants.

108.   Defendants' actions constitute unlawful intentional retaliation in violation of 42 U.S.C. § 1981.

109.   Defendants willfully and wantonly disregarded Plaintiff's federally protected rights and Defendants' retaliation against Plaintiff was undertaken in bad faith.

110.   As a direct and proximate result of Defendants' violations of 42 U.S.C. § 1981, Plaintiff has suffered damages including lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

111.   Accordingly, Plaintiff is entitled to the equitable and monetary relief set forth in the following prayer for relief for Defendants' violation of her rights under 42 U.S.C. § 1981.

**COUNT III**
**Race Discrimination in violation of Title VII**
*(Against Defendant Grady)*

112.   Paragraphs 1 through 85 are incorporated herein by reference.

113.   Plaintiff is in a protected class based on her race (African American)

114.   Plaintiff is an "employee" as defined by Title VII, 42 U.S.C. § 2000e *et seq.*

115.   Plaintiff was qualified for the position to which she was hired.

116.   Defendant Grady is an "employer" as defined by Title VII, 42 U.S.C. § 2000e *et seq.*

117.   Defendant Grady discriminated against Plaintiff in the terms and conditions of her employment when, among other things, its leaders treated her differently and less favorably because of her race and terminated her employment.

118.   Defendant Grady undertook this unlawful conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, entitling her to recover punitive damages against Defendant Grady.

119.   Additionally, or in the alternative, Defendant Grady undertook its unlawful conduct recklessly with respect to Plaintiff and her federally protected rights, entitling her to recover punitive damages.

120.   As a direct and proximate result of the Defendant Grady's actions, Plaintiff suffered damages including stress, inconvenience, loss of income and benefits, humiliation, and other indignities.

121.   Plaintiff is entitled to an award of back pay and benefits, compensatory damages, attorney's fees, punitive damages, and all other appropriate damages, remedies, and other relief available under Title VII and all federal statutes providing remedies for violations of Title VII.

## COUNT III
## Sex Discrimination in Violation of Title VII
### *(Against Defendant Grady)*

122.   Paragraphs 1 through 85 are incorporated herein by reference.

123.   Plaintiff is in a protected class based on her sex (female).

124.   Plaintiff is an "employee" as defined by Title VII, 42 U.S.C. § 2000e *et seq.*

125.   Plaintiff was qualified for the position to which she was hired.

126.   Defendant Grady is an "employer" as defined by Title VII, 42 U.S.C. § 2000e *et seq.*

127.   Defendant Grady discriminated against Plaintiff in the terms and conditions of her employment when, among other things, it treated her differently and less favorably because she was a female as compared to her male peers.

128.   Defendant Grady undertook this unlawful conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, entitling her to recover punitive damages against Defendant.

129.   Additionally, or in the alternative, Defendant Grady undertook its unlawful conduct recklessly with respect to Plaintiff and her federally protected rights, entitling her to recover punitive damages.

130.   As a direct and proximate result of the Defendant Grady's actions, Plaintiff suffered damages including stress, inconvenience, loss of income and benefits, humiliation, and other indignities.

131.   Plaintiff is entitled to an award of back pay and benefits, compensatory damages, attorney's fees, punitive damages, and all other appropriate damages, remedies, and other relief available under Title VII and all federal statutes providing remedies for violations of Title VII.

### COUNT IV
### Retaliation in Violation of Title VII
### *(Against Defendant Grady)*

132.   Paragraphs 1 through 85 are incorporated herein by reference.

133.   Plaintiff engaged in statutorily protected activity by objecting to, reporting, and complaining of race discrimination prohibited by 42 U.S.C. § 1981 and race and sex discrimination prohibited by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* including but not limited to making internal complaints and the filing of a charge of discrimination with the EEOC.

134.   Defendant Grady subjected Plaintiff to retaliation for her protected conduct, including, but not limited to, demeaning and exclusionary treatment, disparate treatment in her scheduling and assignments, unjustified interference with

her recredentialing and livelihood, unjustified criticism, excessive scrutiny, and her constructive termination in violation of Title VII.

135.   Defendant Grady undertook this unlawful conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, entitling her to recover punitive damages against Defendant Grady.

136.   Additionally, or in the alternative, Defendant Grady undertook its unlawful conduct recklessly with respect to Plaintiff and her federally protected rights, entitling her to recover punitive damages.

137.   As a direct and proximate result of the Defendant Grady's actions, Plaintiff suffered damages including stress, inconvenience, loss of income and benefits, humiliation, and other indignities.

138.   Plaintiff is entitled to an award of back pay and benefits, compensatory damages, attorney's fees, punitive damages, and all other appropriate damages, remedies, and other relief available under Title VII and all federal statutes providing remedies for violations of Title VII.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands a TRIAL BY JURY and requests the following relief:

a. a declaratory judgment that Defendant Grady violated Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e et seq.

b. a  declaratory judgment that Defendants Grady and Gershon violated 42 U.S.C. § 1981;

c. a permanent injunction, prohibiting Defendants from engaging in unlawful employment practices in violation of Title VII or 42 U.S.C. § 1981;

d. full back pay from the date of Plaintiff's unlawful termination, taking into account all raises to which she would have been entitled but for the unlawful termination, and all fringe and pension benefits of employment, with prejudgment interest thereon;

e. reinstatement to Plaintiff's former position with Defendant Grady at the same pay grade, or in the alternative, front pay to compensate Plaintiff for lost future wages and benefits;

f. compensatory damages in an amount to be determined by the enlightened conscience of the jury, for Plaintiff's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages;

    g.  punitive damages against Defendants;

    h.  attorneys' fees and costs; and

    i.  all other and further relief as this Court deems just and proper.

Respectfully submitted this 19th day of November 2021.

**BUCKLEY BEAL, LLP**

*/s/ Thomas J. Mew*
Thomas J. Mew
GA Bar No. 503447
tmew@buckleybeal.com
Joseph B. Quattlebaum
GA Bar No. 319971
jquattlebaum@buckleybeal.com

600 Peachtree Street NE
Suite 3900
Atlanta, GA 30308
Telephone: (404) 781-1100
Facsimile: (404) 781-1101